UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:19-cv-22529-ALTONAGA/REID

**Maricela Mata and Mario Echevarría,**

Plaintiffs,

v.

**Expedia Group, Inc.**, **Expedia, Inc.**, **Hotels.com L.P.**, **Hotels.com GP, LLC**, **and Orbitz, LLC**,

Defendants.

# JOINT PRETRIAL STIPULATION

Plaintiffs Maricela Mata and Mario Echevarría ("Plaintiffs") and Defendants Expedia Group, Inc., Expedia, Inc., Hotels.com L.P., Hotels.com GP, LLC, and Orbitz, LLC (collectively, "Defendants") file this Joint Pretrial Stipulation pursuant to Local Rule 16.1(e).

## (1) Statements of the Case

### a. Plaintiffs' Statement of the Case

This case arises under Title III of the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §§ 6021–6091 (the "Helms-Burton Act" or the "Act"). Congress enacted Title III to deter the exploitation of property confiscated from Cuban nationals and United States nationals by the communist Cuban government and to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6). The Act provides U.S. nationals with a private cause of action against any person who "traffics" in property confiscated by the Cuban government on or after January 1, 1959. 22 U.S.C. § 6082(a)(1)(A). The Eleventh Circuit has recognized that the Helms-Burton Act "imposes broad liability" because "Congress designed the Act not just to compensate victims of the Castro regime, but to deter third parties from using or benefitting from confiscated property." *Fernandez v. Seaboard Marine Ltd.*, 135 F.4th 939, 955 (11th Cir. 2025).

The Helms-Burton Act defines trafficking to include knowingly and intentionally: (i) selling, transferring, brokering, managing, using, or otherwise acquiring or holding an interest in confiscated

property; (ii) engaging in "a commercial activity using or otherwise benefiting from confiscated property"; or (iii) "caus[ing], direct[ing], participat[ing] in, or profit[ing] from, trafficking … by another person, or otherwise engag[ing] in trafficking … through another person." 22 U.S.C. § 6023(13)(A). The Act's definition of "commercial activity" encompasses "a regular course of commercial conduct." 22 U.S.C. § 6023(3); 28 U.S.C. § 1603(d).

### *A. The Plaintiffs and Their Claims*

Plaintiff Maricela Mata is a U.S. national residing in Miami, Florida. She holds a valid claim to the Hotel San Carlos—a historic hotel located at Calle de San Carlos, No. 143, Cienfuegos, Cuba—by inheritance from her father, Antonio Alberto Lazaro Mata, who inherited from his father, Antonio Mata Alvarez. Antonio Mata Alvarez built and operated the Hotel San Carlos beginning in June 1928 and continuously until it was confiscated by the Cuban communist regime on or about December 4, 1962, from Antonio Alberto Lazaro Mata. Antonio Mata Alvarez died intestate in Cuba on January 4, 1959, and his interest passed by Cuban intestacy law to his son, Antonio Alberto Lazaro Mata. Antonio Alberto Lazaro Mata died intestate in Cuba on August 26, 1979, and his interest passed by Cuban intestacy law to his children, including Maricela Mata. Mata has been a U.S. national since July 29, 2002, and inherited her claim before bringing this action. She asserts a 50% ownership interest in the Hotel San Carlos.

Plaintiff Mario Echevarría is a U.S. national since March 15, 1983 and resides in Miami, Florida. He holds a valid claim to the island of Cayo Coco, Cuba and to the Cayo Coco Resorts that now stand upon it: the Melia Cayo Coco, the Melia Jardines Del Rey, the Sol Cayo Coco, and the Tryp Cayo Coco (the "Cayo Coco Resorts"). His claim traces through the Cuevas family, who acquired, possessed, and used Cayo Coco for decades before its confiscation by the Cuban regime after January 1, 1959. Julián Cuevas devised Cayo Coco by will to his five surviving children, Emilio, Julio, Maria Teresa, Carmen, and Elvira Cuevas. Through successive intestate inheritance under Cuban and Florida law, ownership passed ultimately to Mario Echevarría and his siblings and co-heirs. Mr. Echevarría asserts a 12.5% ownership interest in Cayo Coco.

### *B. Defendants and Their Trafficking*

Defendants Expedia Group, Inc., Expedia, Inc., Hotels.com L.P., Hotels.com GP, LLC, and Orbitz, LLC (collectively, the "Expedia Defendants") are a family of online travel companies. Beginning no later than August 2017, defendants knowingly and intentionally engaged in commercial activities using or benefiting from, and otherwise trafficked in, the Hotel San Carlos, the Meliá Cayo Coco, the Meliá Jardines Del Rey, the Sol Cayo Coco, and the Tryp Cayo Coco (collectively, the

"Subject Hotels" or "Trafficked Hotels"). Defendants did not have the authorization of plaintiffs or any other U.S. national holding a claim to the properties.

Defendants operated their Cuba business through a dedicated "Cuba Team" based in Miami, Florida, at Expedia's offices at 701 Brickell Avenue. The Cuba Team coordinated directly with hotel operators and Cuban government entities including the Cuban Ministry of Tourism (MinTur), Gran Caribe, Cubanacan and Gaviota—which is controlled by or acting on behalf of the Cuban military and intelligence services. Defendants entered into lodging supply contracts with hotel operators at the Subject Hotels, listed and offered reservations on their interactive websites, collected booking fees and commissions, and engaged in marketing and advertising campaigns promoting travel to Cuba and specifically to the Trafficked Hotels.

Defendants operated through a deliberately blurred corporate structure that they themselves acknowledge is "trick[y]" and about which even their own corporate representative was unsure. Internally, Defendants use "Expedia Group" interchangeably to refer to both the publicly traded parent company and its "umbrella of brands." The Cuba Team members worked and represented themselves on behalf of all defendant brands and entities—Expedia, Orbitz, Hotels.com, and Trivago—often without knowing which entity formally paid their wages. Defendants shared common executives, a common legal department, common data analytics and storage, and entered into single, collective contracts that allowed any of them to list stays at the Subject Hotels. Each defendant also participated in or profited from the trafficking of the others.

Expedia Group, Inc., though defendants characterize it as merely a "holding company," describes itself in its own 2025 10-K as follows:

> Expedia Group, Inc. is the global travel marketplace with one purpose: to help travelers explore the world, one journey at a time. We connect travelers, partners, and advertisers throughout our trusted brands, leading technology, and rich first-party data, delivering predictive, personalized experiences that shape the future of travel.

Expedia Group's profit and revenue flows directly from its subsidiaries' operations. Expedia Group itself applied for a specific OFAC license to transact in Cuba on behalf of its subsidiaries and affiliates including Trivago. Hotels.com GP, LLC, as the general partner of Hotels.com L.P., directed and controlled that entity's actions and is jointly and severally liable for its trafficking as a matter of Texas law.

In addition to directly receiving commissions and fees for booking the Subject Hotels, each defendant used and benefited from the Trafficked Properties by receiving advertising revenues

from listing and promoting the Subject Hotels, and by harvesting and exploiting customer data generated from customers' interactions with the Subject Hotels on defendants' platforms. That click-stream and customer data was retained in defendants' systems for at least 37 months after the last customer interaction with those properties, and was used to optimize defendants' platforms and generate additional advertising revenue.

***Defendants' Knowledge***

Defendants have been on notice of potential Helms-Burton liability since 1996. On July 16, 1996, President Clinton publicly stated that "all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States." President's Statement on Action on Title III, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996). Defendants were closely monitoring OFAC regulations and the Helms-Burton Act as early as 2010, and increasingly from 2015 onward.

The Cuba Team included individuals who had personally fled Cuba to escape persecution and who were aware of the pervasive confiscation of property in Cuba. One Cuba Team member specifically testified that hotels built before 1959—such as the Hotel San Carlos—were "probably" confiscated. Cuba Team members were aware that the Cuban government, including its military and intelligence services, controlled the Subject Hotels. Cuba Team members were actively attempting to ingratiate themselves with high-level Communist Party members with access to the Castro family. Yet Defendants provided no training to Cuba Team members on identifying confiscated hotels, made no effort to obtain ownership or confiscation information about the Subject Hotels before listing them, and processed the Subject Hotels through the same onboarding as a hotel in "Wichita, Kansas." Defendants began offering bookings at the Subject Hotels in 2017.

On June 17, 2019, Plaintiff Maricela Mata sent notice letters -stating she owned a claim to the Hotel San Carlos, and her intent to file a class action including all Melia Hotels in Cuba. The letters were delivered on June 19, 2019. Every defendant acknowledged receipt of and awareness of this notice. Defendants admit they had no authorization from any U.S. national to traffic in the Subject Hotels. Defendants also admit that no person from the U.S. Government ever told them they had license to violate the Helms-Burton Act. Defendants continued to traffic in the Hotel San Carlos by failing to cancel existing reservations after receiving the notice and continuing to make payments to the Hotel San Carlos and as further set forth below.

No later than September 11, 2019, Expedia, Inc. was on specific notice of Plaintiff Mario Echeverria's claims and lawsuit regarding the Cayo Coco Hotels. Defendants continued to traffic in the Cayo Coco Hotels through 2022 and beyond.

*Trivago and Continuing Trafficking*

Trivago N.V. is a majority-controlled subsidiary of Expedia, Inc. and Expedia Group, Inc. that operates as a hotel metasearch brand. The Cuba Team represented themselves as Trivago agents, communicated on behalf of Trivago with Cuban hotels including the Subject Hotels, and Expedia Group, Inc. applied for a specific OFAC license to transact in Cuba on behalf of Trivago. At least until December 8, 2025, Trivago continued to list the Hotel San Carlos on its metasearch platform and receive revenue—inuring to the benefit of Defendants—for referring inquiries to other booking websites. The Melia Cayo Coco and Sol Cayo Coco were listed on Trivago at least until August 26, 2025. Expedia, Inc. continued to email customers promoting Cayo Coco as a destination at least until January 17, 2024, and continued advertising Cayo Coco on its website at least until March 13, 2024.

*The Lawful Travel Defense Fails*

Defendants assert an affirmative defense under the Helms-Burton Act's exception for "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. § 6023(13)(B)(iii). Every court in this District that has addressed this issue has held that the lawful travel exception is an affirmative defense that Defendants must plead and prove. *See Rivero v. Expedia Group, Inc.*, No. 19-22629-CIV, 2023 WL 12039284, at *6 (S.D. Fla. Sept. 13, 2023). The defense has three elements: (1) lawful travel to Cuba; (2) that the transactions and uses of confiscated property were incident to that lawful travel; and (3) that the transactions and uses were necessary to the conduct of such travel.

Defendants cannot sustain any element of this defense. First, defendants collected no information whatsoever about whether the use of a Subject Hotel or Defendants' platforms was "necessary" to any traveler's travel, and they acknowledge having no such evidence. Defendants themselves acknowledge there were over a thousand other accommodations available in Cuba, and that their platforms were never the exclusive means to book any Cuban hotel. Second, the only evidence Defendants have of any traveler's purpose of travel is an unverified self-certification drop-down menu—and that was completed only by the person making the booking, not each individual traveler. Defendants did nothing to verify whether any customer's reason-for-travel selection was true. Those

hearsay certifications are inadmissible under Fed. R. Evid. 801–802, and cannot be presented in admissible form because Defendants have not disclosed or deposed any of those declarants. Third, Defendants promoted tourist travel to Cuba—which was never authorized under 31 C.F.R. § 515.560(f)—by developing internal business plans around the "Cuba Opportunity," referring internally to "tourist" travel, and coordinating with MinTur to market Cuba as a tourism destination. Fourth, the OFAC licenses Defendants rely upon expressly did not "authorize any transaction prohibited by" the Helms-Burton Act. 31 C.F.R. § 515.101(b). In any event, Defendants were not in full compliance with the terms or record-keeping requirements of the OFAC licenses.

*Damages*

The Helms-Burton Act provides for damages equal to the current fair market value of the confiscated property, or the amount certified by the Foreign Claims Settlement Commission, whichever is greater. 22 U.S.C. § 6082(a)(1)(A)(i). Plaintiffs are also entitled to reasonable attorneys' fees and costs, 22 U.S.C. § 6082(a)(1)(A)(ii), and to treble damages for trafficking that continues after 30 days following notice, 22 U.S.C. § 6082(a)(3)(C).

Plaintiffs will present expert testimony from Francis Nardozza regarding the current fair market value of the Subject Hotels. His opinions reflect the following minimum valuations: Hotel San Carlos, at least $2,700,000; Melía Cayo Coco, at least $11,700,000; Melía Jardines Del Rey, at least $38,100,000; Sol Cayo Coco, at least $8,700,000; Tryp Cayo Coco, at least $15,300,000. Plaintiff Maricela Mata owns a claim to the Hotel San Carlos and Plaintiff Mario owns a claim to the Cayo Coco Resorts. Defendants' continued trafficking after notice entitles Plaintiffs to treble those amounts. Plaintiffs also seek reasonable attorneys' fees and costs.

**b. Defendants' Statement of the Case**

Except to the extent indicated in the Stipulated Facts herein or in Defendants' Answer, Defendants dispute all of the assertions in Plaintiffs' Statement of the Case, and their execution of this Joint Pretrial Stipulation is not a waiver of their right to dispute those assertions, nor is it a concession that any of those assertions are within the scope of or relevant to Plaintiffs' pleaded causes of action.

In 2017, defendant Expedia, Inc., a Washington corporation ("Expedia, Inc.")[1] and certain of its subsidiaries, including defendants Hotels.com L.P., and Orbitz, LLC (together with Expedia,

[1] In other filings in this case, Defendants have assigned Expedia, Inc. the moniker "Expedia-WA" for clarity. At Plaintiffs' request, however, this pretrial stipulation uses the legal name "Expedia,

Inc., the "Operating Defendants"), began offering online booking services for various hotels in Cuba pursuant to the express authorization provided in general and specific licenses granted by the Office of Foreign Assets Control ("OFAC"). Specifically, beginning in May 2017, the Operating Defendants offered online hotel bookings at certain hotels in Cuba pursuant to lodging supply contracts with hotel operators and suppliers of third-party inventory ("Lodging Inventory"). Additionally, starting in early 2017, Expedia, Inc. and, for a short period in 2018, defendant Orbitz, LLC ("Orbitz") offered users of certain Canadian websites the ability to book third party packages ("3PP") under contracts with third-party companies ("3PP partners") that packaged stays at Cuban hotels with other travel components, such as flights and transportation ("3PP Inventory"). Defendant Expedia Group, Inc. is a holding company and has never offered booking services at any hotel, including hotels in Cuba. Defendant Hotels.com GP, LLC ("Hotels.com GP") is the general partner of Hotels.com LP and also never offered booking services at any hotel, including hotels in Cuba.

Among the Cuban hotels for which the Operating Defendants offered Lodging Inventory is the Hotel San Carlos, as well as the Meliá Cayo Coco, the Jardines Del Rey, the Sol Cayo Coco, and the Tryp Cayo Coco (the "Cayo Coco Hotels" and, together with the Hotel San Carlos, the "Subject Hotels"). Additionally, the Cayo Coco Hotels were among the hotels included in 3PP Inventory available through Canadian websites operated by Expedia, Inc. and Orbitz. The Hotel San Carlos is located in Cienfuegos, Cuba. The Cayo Coco Hotels are located on the island of Cayo Coco, a key located off the northern coast of mainland Cuba. Expedia, Inc. and the Operating Defendants began offering Lodging Inventory at the Hotel San Carlos in February 2018, at the Meliá Cayo Coco in September 2017, at the Jardines Del Rey in September 2017, at the Sol Cayo Coco in August 2017, and at the Tryp Cayo Coco in August 2017. Expedia, Inc. began facilitating 3PP bookings that included stays at the Cayo Coco Hotels in February 2017. Orbitz began offering 3PP Inventory that included stays at hotels in Cuba—including at least two of the Cayo Coco Hotels—in April 2018, but ceased doing so just months later in July 2018 (for reasons unrelated to the Helms-Burton Act).

Plaintiff Maricela Mata ("Mata") claims that her grandfather and, later, father owned the Hotel San Carlos prior to its alleged confiscation by the Cuban government. Plaintiff Mario Echevarría ("Echevarría") claims that his family owned Cayo Coco prior to its alleged confiscation by the Cuban government in the 1960s, and that the Cayo Coco Hotels were subsequently built on Cayo Coco. Mata alleges that Defendants, in violation of Title III of the Cuban Liberty and Democratic Soli-

---

Inc." instead. Thus, all references to "Expedia, Inc." in this pretrial stipulation refer to defendant Expedia, Inc., the Washington corporation previously referred to as "Expedia-WA."

darity Act (the "Helms-Burton Act"), trafficked in the Hotel San Carlos by knowingly and intentionally engaging in a commercial activity using or otherwise benefitting from the Hotel San Carlos without the authorization of any United States national who holds a claim to the property. 22 U.S.C. § 6023(13)(A)(ii). Echevarria makes the same allegation against Expedia, Inc.[2] as to the Cayo Coco Hotels.[3] Plaintiffs allege that Defendants directly trafficked in the Subject Hotels by (i) facilitating bookings at the hotels in exchange for commissions and other fees; (ii) receiving advertising revenues in connection with the offering of bookings at the Subject Hotels, and (iii) "us[ing] and benefitting from data they obtained from potential customers" even where customers did not book one of the Subject Hotels. Plaintiffs also allege that each Defendant knowingly and intentionally participated in or profited from each other's alleged trafficking. *See id.* § 13(A)(iii).

Contrary to Plaintiffs' statement of the case, neither Plaintiff has pleaded a cause of action against any Defendant based on the alleged trafficking of any non-party, including Trivago. Nor have Plaintiffs asserted any basis for holding any Defendant vicariously liable with any other Defendant or non-party, except to the extent that Hotels.com GP, LLC is jointly and severally liable with Hotels.com LP.

To prevail on their causes of action, then, Plaintiffs must prove, among other things, that (i) they own the claim to property confiscated by the Cuban government, and (ii) Defendants either "knowingly and intentionally" engaged in commercial activity using or otherwise benefitting from that confiscated property, or participated in or profited from such commercial activity engaged in by another Defendant, without the authorization of any U.S. national that owns a claim to the property. *See* 22 U.S.C. § 6082(a)(1)(A).

Plaintiffs' causes of action fail for several independent reasons, including but not limited to the following:

**First**, Plaintiffs' causes of action against Expedia, Inc. are barred by the Act's statute of repose, which states that "an action under section 6082 of this title may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. Expedia, Inc. was not sued in this case until July 14, 2025. (*See* ECF No. 148.) All of its alleged trafficking conduct ceased well before July 14, 2023, as did the alleged trafficking conduct of all other Defend-

---

[2] Echevarria's causes of action against the other Defendants were dismissed. (ECF No. 173.)

[3] To the extent Plaintiffs' statement of the case implies that they seek to establish trafficking under any parts of 22 U.S.C. § 6023(13)(A) other than direct trafficking under item (ii) or indirect trafficking for allegedly participating in or profiting from each other's conduct, Defendants' position is that such a theory is not pleaded, and Defendants expressly do not consent to the trial of such theories.

ants. The statute of repose cannot be tolled under *American Pipe* because (i) *American Pipe* tolling does not apply to statutes of repose and (ii) in any event, Expedia, Inc. was not a party to the previous putative class actions on which any such tolling argument would be based. Plaintiffs' causes of action against Expedia, Inc. also do not relate back to any previous complaint because (i) relation-back does not apply to statutes of repose, and (ii) the requirements for relation back under Rule 15(c)(1) are not satisfied. *See* Fed. R. Civ. P. 15(c)(1)(A).

**Second**, neither Mata nor Echevarría has evidence sufficient under Cuban law to prove that their ancestors owned the Subject Hotels or that the Cuban government confiscated the Subject Hotels from Plaintiffs' ancestors. Plaintiffs also lack evidence to show that they inherited an ownership interest in the Subject Hotels, much less evidence to show that they own claims to the specific percentage interests that they allege, 50% for Mata and 12.5% for Echevarria. Thus, Plaintiffs cannot prove that they own a claim to the Subject Hotels.

**Third**, there is no evidence that, at the time of the alleged trafficking conduct, any Defendant knew or had reason to know that (i) the Subject Hotels had been confiscated (as that term is defined in the Act) and (ii) Plaintiffs were U.S. nationals who actually owned claims to the Subject Hotels. *See* 22 U.S.C. § 6023(9) (defining *knowingly*); *id.* § 6023(13) (defining *traffics*). The earliest date that Defendants could have possibly had reason to know those facts—i.e., when they first had information making Plaintiffs' "claim to confiscated property in Cuba 'substantial' or 'highly probable,'" *Del Valle v. Trivago GMBH*, No. 23-12966, 2025 WL 1443951, at *4 (11th Cir. May 20, 2025)—was when Plaintiffs first provided documents beyond "unsworn assertions of property ownership" and a "story of ancestral inheritance," *id.* at *6. And that did not occur for Echevarria until July 2023 and for Mata until September 12, 2025—well after all alleged trafficking activity ceased.

Further, even if notice of mere unsworn allegations was sufficient to give Defendants knowledge or reason to know of the facts necessary to satisfy the Act's scienter requirement, Defendants did not learn of Mata's assertions until June 19, 2019, when her counsel sent a letter alleging that she owned a claim to the San Carlos. Operating Defendants did not engage in any conduct that could constituted trafficking after that date; the last booking made at the Hotel San Carlos through any website operated by Operating Defendants was made on June 18, 2019, and it was placed on Stop Sell Status on June 19, 2019.

Similarly, Expedia, Inc. did not learn of Echevarria's alleged ownership of a claim to the Cayo Coco Hotels until after the other Defendants were served with the first amended complaint in

this case on September 13, 2019. Thus, no bookings that were made or other conduct that occurred prior to that date can constitute trafficking.

**Fourth**, under the Helms-Burton Act, excluded from the definition of *traffics* are certain categories of desirous conduct, including transactions and uses of property incident and necessary to lawful travel to Cuba. *See* 22 U.S.C. § 6023 (13)(B)(iii). At all times during the Operating Defendants' dealings with the Subject Hotels, they offered booking services in compliance with OFAC regulations and the authority granted to them through the licenses, and thus did not *traffic* as a matter of law.

**Fifth**, there is no evidence that any Defendants trafficked by participating or profiting from trafficking by any other Defendant (3d Am. Compl. ¶ 81) because (i) there is no evidence that any Defendant committed trafficking directly, and (ii) there is no evidence that any Defendant participated in or profited from the alleged trafficking of any other Defendant within the meaning of 22 U.S.C. § 6023(13)(A)(iii). Indeed, to the extent Echevarria seeks to prove that Expedia, Inc. is liable for trafficking allegedly committed by any other Defendant, his cause of action is barred by res judicata to the same extent as his causes of action against the other Defendants. *See Hilliard v. Gutierrez*, No. 21-CV-20513, 2021 WL 2712122, at *10 (S.D. Fla. July 1, 2021); *Freecharm Ltd. v. Atlas Wealth Holdings Corp.*, No. 11-20003-CIV, 2011 WL 4591929, at *7 (S.D. Fla. Sept. 30, 2011), *aff'd*, 499 F. Appx. 941 (11th Cir. 2012).

**Sixth**, Echevarria's cause of action against Expedia, Inc. is barred under the doctrine of claim preclusion.

**Seventh**, Plaintiffs have no evidence of the statutorily authorized measure of damages because the only proffered evidence of damages are the expert reports of Francis Nardozza, and his testimony is inadmissible. And even if Mr. Nardozza is permitted to testify, his opinions are insufficient evidence of the proper measure of statutory damages. Moreover, any award of damages in the ranges identified by Mr. Nardozza would violate due process. For example, the total revenue generated from bookings at the San Carlos made through websites operated by the Operating Defendants is $6,445. Even Mr. Nardozza's most conservative calculation (adjusted for Mata's alleged claim to a 50% interest in the San Carlos) of Mata's statutory damages is $1,350,000, which is more than 209 times the revenue generated from bookings at that hotel. The multiple increases to 628 times the revenue if the damages are trebled, as Mata requests. The damages Echevarria seeks based on the Cayo Coco Hotels are similarly excessive.

**Finally**, even if Plaintiffs could overcome all of those defects, their causes of action are barred by the other legal and factual infirmities listed in the other sections below.

### (2) The Basis of Federal Jurisdiction

The Court has federal jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, and specifically, 22 U.S.C. § 6082. Defendants contend that Plaintiff lacks standing under Article III of the U.S. Constitution and, thus, that the Court lacks subject matter jurisdiction.

### (3) The Pleadings Raising the Issues

1. Plaintiff's Third Amended Complaint (ECF No. 148).
2. Defendants' Answer and Affirmative Defenses to Plaintiff's Third Amended Complaints (ECF No. 184).

### (4) Undisposed of Motions or Other Matters Requiring Action by the Court

1. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 272)
2. Defendants' Motion for Summary Judgment (ECF No. 275)
3. Plaintiffs' Motion to Exclude Testimony of Ambar Diaz and Adam Smith (ECF No. 271)
4. Defendants' Motion to Exclude Testimony of Frank Nardozza, Avelino Gonzalez, and Scott Edmonds (ECF No. 269)
5. Plaintiffs' Renewed Appeal of Magistrate Judge Discovery Order (ECF No. 286)
6. Plaintiffs' Appeal of Magistrate Judge Discovery Order (ECF No. 301) (ECF No. ___).
7. Plaintiffs' Motions in Limine (ECF No. ___)
8. Defendants' Motions in Limine (ECF No. ___)

### (5) Statement of Uncontested Facts[4]

***Regarding Marciela Mata***

1. The Hotel San Carlos is located in Cienfuegos, Cuba.
2. Mata was born in Cuba in 1960.

[4] By not including a fact or issue here, the parties neither represent nor concede that there is a genuine dispute as to any such fact or issue nor that any fact here is relevant or otherwise admissible at trial. Plaintiffs also reserve the right to amend these items to the extent their pending motions to compel and appeals thereof regarding Trivago reveal additional facts or evidence. Defendants dispute that Plaintiffs have any such right.

3. Mata became a U.S. Citizen after March 12, 1996 and before she filed this lawsuit and remains a U.S. Citizen.
4. Neither Antonio Mata y Alvarez nor Antonio Alberto Lazaro Mata was ever a United States citizen. Rather, they were citizens of Cuba.

*Regarding Mario Echeveria*

5. The Melia Cayo Coco, Melia Jardines Del Rey, Sol Cayo Coco, and Tryp Cayo Coco (the "Cayo Coco Hotels") are located on the island of Cayo Coco, off the northern coast of Cuba.
6. Echeveria was born in Cuba in 1935
7. Echeveria became a U.S. Citizen on March 15, 1983 and remains a U.S. Citizen.
8. Juan Francisco Angulo was never a U.S. national.
9. Julian Cuevas was never a U.S. national.
10. None of Julian Cuevas's children were U.S. nationals.
11. All of Julian Cuevas's children were instead Cuban citizens.
12. Echevarria's brother, Carlos Echevarria, died in Florida on July 7, 1988. A true and correct copy of his Last Will and Testament was produced at MATA PROD_001518–1522.
13. Echevarria's sister, Carmen Echevarria, died in Florida on July 12, 2010. A true and correct copy of her Last Will and Testament was produced at MATA PROD_001523–1527.

*Regarding Defendants*

14. Expedia Group, Inc. ("Expedia Group, Inc.") is a Delaware corporation that was formed in 2005 under the name Expedia, Inc. Effective March 26, 2018, its name was changed to Expedia Group, Inc.
15. Expedia Group Inc.'s principal place of business is in Seattle, Washington.
16. Expedia, Inc. ("Expedia, Inc."), a wholly-owned subsidiary of Expedia Group, Inc., was incorporated in Washington in 1999 as Expedia, Inc., and continues to operate under that name today.
17. Expedia, Inc. was first named as a defendant in this action through the Third Amended Complaint ("TAC") filed on July 14, 2025. The TAC also added Echevarria as a plaintiff and his cause of action for trafficking in the Cayo Coco Hotels.

18. During the relevant time-period, Orbitz, LLC was a Delaware limited liability company, which was wholly owned by Orbitz, Inc., a Delaware corporation, which was wholly owned by Orbitz Worldwide, LLC, a Delaware limited liability corporation, which was wholly owned by Orbitz Worldwide, Inc. a Delaware corporation, which was wholly owned by Expedia, Inc.
19. Hotels.com LP is Texas limited partnership, is owned by HRN 99 Holdings, LLC, a New York limited liability company, and Hotels.com GP, LLC, a Texas limited liability company. Each of HRN 99 Holdings, LLC and Hotels.com GP, LLC is wholly owned by Expedia, Inc.
20. Hotels.com GP LLC, which is wholly owned by Expedia, Inc., is the general partner of Hotels.com LP.

***Regarding General OFAC Licenses***

21. During the relevant time period OFAC issued a number of general licenses authorizing certain travel to Cuba, authorizing certain transactions related to travel to Cuba, and authorizing certain transactions related to those authorized transactions.

***Regarding Specific OFAC Licenses***

22. On December 16, 2016, OFAC issued Specific License No. CU-2016-329116-1 (the "Original Specific License"). A true and correct copy of the Original Specific License was produced at EG_00000949–950.
23. On January 31, 2019, OFAC issued Specific License No. CU-2016-329116-2, which effectively extended the expiration date of the Original Specific License to March 31, 2019. A true and correct copy of that license was produced at EG_00001028–1029.
24. On March 29, 2019, OFAC issued Specific License No. CU-2016-329116-3, which effectively extended the expiration date of the Original Specific License to April 15, 2019. A true and correct copy of that license was produced at EG_00001035–1036.
25. On April 15, 2019, OFAC issued Specific License No. CU-2016-329116-4, which effectively extended the expiration date of the Original Specific License to April 30, 2019. A true and correct copy of that license was produced at EG_00001016–1017.
26. On April 30, 2019, OFAC issued Specific License No. CU-2016-329116-5 (the "Renewed Specific License"). A true and correct copy of the Renewed Specific License was produced at EG_00000982–984.

27. The original specific license did not require the licensees to obtain any reason-for-travel certifications from travelers not subject to U.S. jurisdiction.

*Regarding Operating Defendants' Offering of Hotel Bookings in Cuba*

28. In the first half of 2017, the Operating Defendants[5] began offering hotel bookings in Cuba. under general and specific licenses from the U.S. government.

29. In February 2017, Expedia, Inc. began offering travelers accessing certain of its Canadian websites the ability to book third-party package ("3PP") inventory ("3PP Inventory") under contracts with third-party companies ("3PP partners") that packaged stays at Cuban hotels, including the Cayo Coco Hotels, with other travel components, such as flights and transportation.

30. For a short time in 2018, Orbitz also offered 3PP Inventory that includes stays at two of the Cayo Coco Hotels through a travel rewards site for customers of Royal Bank of Canada ("RBC").

31. Neither Expedia, Inc. nor its subsidiaries contracted with the component travel providers, such as hotel suppliers, to offer 3PP Inventory; rather, the 3PP partner contracted directly with the component traveler providers making up each 3PP booking, acted as the merchant of record for the entire 3PP transaction amount, and remitted a commission to Expedia, Inc. or its relevant subsidiary for any of the 3PP bookings.

32. In May of 2017, Expedia, Inc. also began offering reservations at certain hotels in Cuba through various websites operated by the Operating Defendants pursuant to lodging supply contracts with the hotel operators and suppliers of third-party inventory ("Lodging Inventory").

33. With Lodging Inventory bookings, Expedia, Inc. or one of its operating subsidiaries was the merchant of record and collected the full price of the booking from the traveler at the time of the booking.

*Regarding OFAC Compliance*

34. To comply with the general and specific licenses from OFAC, described above, the Operating Defendants developed a self-certification module.

35. This module was part of the checkout process for any hotel in Cuba offered through Lodging Inventory on any website operated by the Operating Defendants.

[5] For purposes of this pre-trial stipulation, the "Operating Defendants" are defined as Expedia, Inc., Hotels.com L.P., and Orbitz, LLC.

36. In its initial implementation, the self-certification module would ask the user to answer the question, "Are any travelers subject to the jurisdiction of the United States?"

37. If the user answered "Yes," then the user would have to certify that "all travelers under this reservation, including myself, are traveling to Cuba for the following reason:" and then select one of twelve lawful reasons for travel from a drop-down menu or radio-button list. The user would then have to provide their address.

38. If the user who clicked "Yes" to the initial question failed to provide the certification and contact information, they would be unable to book the hotel reservation.

39. If a user clicked "No" to the initial question in the self-certification module's initial form, the user could book without providing a reason-for-travel certification because—under the specific license in effect at the time—the Operating Defendants were not required to collect a reason-for-travel certification from individuals who were not subject to U.S. jurisdiction.

40. By April 5, 2017, the initial Cuba self-certification modules were implemented on all websites through which the Operating Defendants offered reservations at hotels in Cuba.

41. For 3PP Inventory, Expedia, Inc. and Orbitz initially only offered 3PP Inventory bookings that included stays at Cuba hotels to non-US travelers, thus, the checkout process for Cuba 3PP Inventory on the Expedia, Inc. Canada and RBC websites initially included a module that asked the user to certify that the user and every person traveling under that same reservation was not subject to U.S. jurisdiction.

42. If a user attempting to make a Cuba 3PP Inventory booking could not provide the required certification, then the user could not complete a 3PP Inventory booking that included a stay at a hotel in Cuba.

***Regarding Bookings at the Subject Hotels***

43. On April 30, 2019, Expedia, Inc. suspended all 3PP Inventory bookings that included stays at Cuban hotels due to the changes in the specific license.

44. On February 4, 2020, Expedia, Inc. reactivated 3PP Inventory that included hotel stays in Cuba on the Expedia, Inc. websites.

45. To comply with the changes in the relevant legal requirements, Expedia, Inc. modified the 3PP self-certification module so that the module required all customers at-

tempting to book reservations at hotels in Cuba to certify that all individuals traveling under that booking met one of the twelve reasons for lawful travel.

46. The certification was provided by every customer who stayed at the Subject Hotels under a booking made through the Operating Defendants' websites.
47. The Lodging Inventory booking spreadsheets reflect every booking made at the Subject Hotels through a website operated by Operating Defendants. True and correct copies of those spreadsheets were produced at EG_00068066 (the San Carlos); EG_00068063 and EG_00068064 (Melia Cayo Coco); EG_00068065 (Melia Jardines Del Rey); EG_00068067 (Sol Cayo Coco); EG_00068068 (Tryp Cayo Coco); EG_00000889 (Combined).
48. The first Lodging Inventory booking at the San Carlos through a website operated by an Operating Defendant was on February 14, 2018.
49. The San Carlos was never booked through 3PP Inventory.
50. Mata sent letters addressed to "Expedia, Inc.," Orbitz, Hotels.com GP, and Hotels.com LP on June 17, 2019, stating that she owns a claim to the San Carlos, that the hotel was confiscated by the Cuban government, and that she intends to sue the recipients of the letters for trafficking in that property. The letters assert that the recipients "actively solicited persons to book reservations at the [San Carlos]…on its website and ultimately profited from those reservations." The letters also demanded that the recipients "cease trafficking in [the San Carlos]…immediately." Attached to the letters were the Original Complaint in this case and a copy of the Department of Justice's Summary of the Provisions of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, as published in the Federal Register on May 17, 1996 and required by § 6082(a)(8).
51. The letters were delivered on June 19, 2019.
52. On September 11, 2019, an amended complaint was filed in this matter. Mata and, for the first time, Echevarria were among the named plaintiffs, and they asserted causes of action for trafficking in the Subject Hotels. This amended complaint for the first time joined Expedia Group, Inc., Hotels.com LP, Hotels.com GP, LLC, and Orbitz, LLC as defendants in this lawsuit.

53. On December 9, 2019, a second amended complaint was filed in this matter, which removed Echevarria as a named plaintiff and all causes of action related to the Cayo Coco Hotels.
54. On June 19, 2019, the San Carlos was put on a Stop Sell status, which means the hotel could not be booked through Lodging Inventory after that date.
55. On July 1, 2019, the San Carlos was placed on "bookable no" status and has remained so since that date, meaning that the hotel not only could not be booked but also would not appear in searches of Lodging Inventory after that date.
56. The last booking made at the San Carlos through a website operated by Orbitz was on March 1, 2019, and the last check-in was July 2, 2019.
57. The last booking made at the San Carlos through a website operated by Hotels.com LP was on June 18, 2019, and the last check-in was September 2, 2019.
58. The last booking made at the San Carlos through a website operated by Expedia, Inc. was on June 17, 2019, and the last check-in date was November 14, 2019.
59. The last date on which a traveler stayed at the San Carlos under a booking made through any Operating Defendants' website was on November 15, 2019.
60. The total commission revenue generated through bookings made at the San Carlos on any of the Operating Defendants' websites was $6,444.78.
61. On September 30, 2019, the Meliá Cayo Coco's primary property number was put on a Stop Sell status, which means the hotel could not be booked through Lodging Inventory under that property number after that date.
62. On October 1, 2019, the Meliá Cayo Coco's primary property number was placed on "bookable no" status and has remained so since that date, meaning that the hotel not only could not be booked but also would not appear in searches of Lodging Inventory after that date.
63. On October 21, 2019, a duplicate property number for the Meliá Cayo Coco was made inactive and has remained so since that date, meaning that the hotel could not be booked and would not appear in searches through Lodging Inventory under that number.
64. The last Lodging Inventory booking made at the Meliá Cayo Coco through a website operated by Expedia, Inc. was on October 19, 2019, and the last check-in date was February 26, 2020.

65. The last Lodging Inventory booking made at the Meliá Cayo Coco through a website operated by Hotels.com L.P. was on September 23, 2019, and the last check-in date was January 29, 2020.
66. The last Lodging Inventory booking made at the Meliá Cayo Coco through a website operated by Orbitz LLC was on July 31, 2019, and the last check-in date was August 12, 2019.
67. On January 31, 2019, the Meliá Jardines Del Rey was put on Stop Sell status, which means the hotel could not be booked through Lodging Inventory after that date.
68. On January 2, 2020, the Meliá Jardines Del Rey was made inactive and has remained so since that date, meaning that the hotel not only could not be booked but also would not appear in searches of Lodging Inventory after that date.
69. The last Lodging Inventory booking made at the Meliá Jardines Del Rey through a website operated by Expedia, Inc. was on November 4, 2017, and the last check-in date was January 25, 2018.
70. The last Lodging Inventory booking made at the Meliá Jardines Del Rey through a website operated by Hotels.com LP. was on January 14, 2019, and the last check-in date was July 28, 2019.
71. No Lodging Inventory bookings were made at the Melía Jardines Del Rey through a website operated by Orbitz LLC.
72. On September 30, 2019, the Sol Cayo Coco was put on a Stop Sell status, which means the hotel could not be booked through Lodging Inventory after that date.
73. On October 1, 2019, the Sol Cayo Coco was put on "bookable no" status and has remained so since that date, meaning that the hotel not only could not be booked but also would not appear in searches of Lodging Inventory after that date.
74. The last non-cancelled lodging booking made at the Sol Cayo Coco through a website operated by Expedia, Inc. was on September 3, 2019, and the last check-in date was February 24, 2020.
75. The last non-cancelled lodging booking made at the Sol Cayo Coco through a website operated by Hotels.com was on September 23, 2019, and the last check-in date was February 22, 2020.

76. The last non-cancelled lodging booking made at the Sol Cayo Coco through a website operated by Orbitz LLC. was on April 23, 2019, and the last check-in date was June 14, 2019.
77. On September 30, 2019, the Tryp Cayo Coco was put on Stop Sell status, which means the hotel could not be booked through Lodging Inventory.
78. On October 1, 2019, the Tryp Cayo Coco was put on "bookable no" status and has remained so since that date, meaning that the hotel not only could not be booked but also would not appear in searches of Lodging Inventory after that date.
79. The last Lodging Inventory booking made at the Tryp Cayo Coco through a website operated by Expedia, Inc. was on September 29, 2019, and the last check-in date was December 8, 2019.
80. The last Lodging Inventory booking made at the Tryp Cayo Coco through a website operated by Hotels.com LP was on September 16, 2019, and the last check-in date was March 6, 2020.
81. The last Lodging Inventory booking made at the Tryp Cayo Coco through a website operated by Orbitz LLC was on March 30, 2019, and the last check-in date was April 7, 2019.
82. The last Lodging Inventory booking at any Cayo Coco Hotel through any Operating Defendant's website was on October 19, 2019, and the last date on which a traveler stayed at a Cayo Coco Hotel under a lodging booking made through any Operating Defendants' website was on March 15, 2020.
83. Expedia, Inc. did not offer any bookings at any of the Subject Hotels after July 14, 2023, which is two years before Expedia, Inc. was named as a defendant.
84. No travelers stayed at the Subject Hotels after July 14, 2023, based on bookings facilitated by Expedia, Inc.

***Regarding Advertising Activities***

85. Expedia Inc.'s Media Solutions ("MeSo") division provided three "DisplayAd" marketing campaigns related to certain hotels in Cuba.
86. DisplayAd campaigns are offered as a service intended to drive bookings at hotels on specific websites and through which the hotels are already offered through Lodging Inventory by displaying banner ads on those websites that, if clicked, lead the user to

a landing page from which the user might then book such hotels through Lodging Inventory.

87. With DisplayAd campaigns, the customer pays a flat fee for a certain number of impressions of the banner ads; the compensation is not based on whether and to what extent the ads are clicked or bookings are made as a result of the ads.

88. MeSo does at times track "conversions" of impressions to bookings in order to evaluate the impact of a campaign.

89. MeSo provided one DisplayAd campaign to promote Meliá hotels in Cuba that began on November 19, 2018, and ended on January 18, 2019.

90. The Meliá campaign did not result in any bookings for the San Carlos, the Meliá Cayo Coco, the Meliá Jardines Del Rey, or the Sol Cayo Coco.

91. MeSo also provided two DisplayAd campaigns for the Cuban Ministry of Tourism (MINTUR) to promote Cuba as a destination.

92. The first MINTUR campaign ended on January 15, 2019.

93. The second MINTUR campaign ended on December 31, 2019.

94. The second MINTUR campaign did not result in any bookings at the San Carlos, the Meliá Cayo Coco, the Meliá Jardines Del Rey, or the Tryp Cayo Coco.

95. Once the Subject Hotels were rendered unbookable through Lodging Inventory, it was impossible for any MeSo campaign to drive any bookings at the hotels.

96. MeSo also offers "TravelAd" campaigns to drive bookings at specific hotels offered through Lodging Inventory, which are based on a pay-per-click compensation model.

97. There were never any TravelAd campaigns for the Subject Hotels.

98. Defendants do not sell first-party data.

99. Expedia's use of first-hand data for internal purposes, such as website optimization, requires use of datasets that include billions of events.

100. Plaintiffs sued Booking.com B.V. and Booking Holdings, Inc. (the "Booking Entities") in this case (and, for Echevarria, in two others), alleging that they trafficked in the Subject Hotels.

101. Plaintiffs settled with the Booking Entities (the "Booking Settlement") and voluntarily dismissed their claims against them.

102. The terms of the Booking Settlement and any value obtained by Mata and

Echevarria have been disclosed in discovery and are not disputed.

**(6) Statement of Issues of Fact to be Litigated at Trial**[6]

1. Whether Mata owns a claim to the San Carlos.
2. If so, whether Mata acquired ownership of that claim the San Carlos before March 12, 1996.
3. Whether the Cuban Government Confiscated the San Carlos on or after January 1, 1959.
4. The issue of Defendants' trafficking subject to the parties' competing statements of the proper scope of that issue below.
5. Whether any relevant transactions and uses of the San Carlos were incident to lawful travel to Cuba and to what extent they were necessary to the conduct of such travel under the Lawful Travel Clause.
6. Whether any Defendant is liable to Mata for damages under the Helms Burton Act relating to the San Carlos?
7. Whether Echevarría owns a claim to the Cayo Coco Hotels, the land underlying them, or both.
8. If so, whether Echevarría acquired ownership of that claim before March 12, 1996.
9. Whether the Cuban Government confiscated Cayo Coco and/or the parts of Cayo Coco where the Cayo Coco Hotels now stand on or after January 1, 1959.
10. Whether any relevant transactions and uses of the Cayo Coco Hotels and/or the land on which they sit were incident to lawful travel to Cuba and to what extent they were necessary to the conduct of such travel, under the Lawful Travel Clause.
11. Whether the parts of the subject property that Echevarría alleges Expedia, Inc. trafficked in were used for residential purposes.
12. Whether any Defendant is liable to Echevarria for damages under the Helms Burton Act relating to any of the Cayo Coco Hotels?
13. The measure of Plaintiffs damages under the Helms Burton Act.
14. Whether Mata sent each of the Defendants by certified mail or personal delivery a notice meeting the requirements in 22 U.S.C. § 6082(a)(3)(D) at least 30 days before

[6] By including an issue below, the parties neither represent nor concede that the evidence actually raises a genuine dispute as to the issue.

joining that Defendant in this lawsuit and, if so, whether the Defendant trafficked in the San Carlos after the 30th day following the date such notice was received.

15. Whether Echevarria sent Expedia, Inc. by certified mail or personal delivery a notice meeting the requirements in 22 U.S.C. § 6082(a)(3)(D) at least 30 days before joining Expedia, Inc. in this lawsuit and, if so, whether Expedia, Inc. trafficked in the Cayo Coco Hotel(s) in question after the 30th day following the date such notice was received.
16. The current fair market value of the property the Defendant(s) trafficked in.

**(6)(a) Plaintiffs' Additional Statement of Issues of fact to be Litigated at Trial**

*Plaintiffs do not intend to list every possible factual issue relevant to the ultimate factual issues above, but only to concisely highlight some of the major additional issues for the Court.*

1. Defendants' knowledge that the Subject Hotels were confiscated prior to receiving notice from Mata in or around June 2019
2. Whether any Defendant trafficked in the San Carlos Hotel, pursuant to 22 U.S.C. §6023(13)(A).
3. Whether any Defendant trafficked in the Cayo Coco Hotels and/or the land on which they sit, 22 U.S.C. §6023(13)(A).
4. Defendants' use of Expedia Virtual Cards or (EVCs) to transact with the Subject Hotels, and specifically to make payments to the Subject Hotels at the time of customer check-in or check-out.
5. Defendants' failure to cancel existing reservation and to allow customers to check in and EVC payments to be made to the Subject Hotels after receiving notice from Mata.
6. Defendants' benefit from the MeSo Campaigns derived from their commercial activity with the Subject Hotels regardless of their direct bookings
7. Defendants' continued trafficking of the Subject Hotels into 2025 relating to their subsidiary, affiliate and co-brand, Trivago, including, but not limited to, Expedia, Inc. through its control of, benefit from, and/or active participation, *etc.*, with Trivago.

8. The Defendants' continued trafficking in the Subject Hotels past 2023 by way of their continued retention and utilization of customer data garnered from their prior bookings.
9. Defendants' failure to comply with the OFAC regulations and licenses including record keeping requirements.

**(6)(b) Defendants' Additional Statement of Issues of fact to be Litigated at Trial:**

1. Regarding Mata's ownership:
    a. Whether Antonio Mata y Alvarez owned an interest in the San Carlos and, if so, the extent and nature of that interest.
    b. Whether Antonio Alberto Lázaro Mata y Suárez inherited the interest, if any, that Antonio Mata y Alvarez owned in the San Carlos when he died.
    c. Whether Mata inherited some or all of the interest, if any, that Antonio Alberto Lázaro Mata y Suárez owned when he died.
2. Regarding Echeveria's ownership:
    a. Whether the Cuban State prior to January 1, 1959, ever validly transferred Cayo Coco to private ownership.
    b. Whether Juan Francisco Angulo owned an interest in Cayo Coco and, if so, the extent and nature of that interest.
    c. Whether Julian Cuevas inherited the interest, if any, that Juan Francisco Angulo owned in Cayo Coco when he died.
    d. Whether Julian Cuevas otherwise acquired an ownership interest in Cayo Coco during his lifetime and, if so, the extent and nature of that interest.
    e. Whether Elvira Cuevas— Echevarría's grandmother—inherited any ownership interest in Cayo Coco and, if so, the extent and nature of that interest.
    f. Whether Rosa Elvira Echevarria— Echevarría's aunt—inherited any ownership interest in Cayo Coco from Elvira Cuevas and, if so, the nature and extent of that interest.
    g. Whether Rosa Elvira Echevarria died intestate.
    h. Whether Julian Echevarria inherited any interest in Cayo Coco from Rosa Echevarria and, if so, the nature and extent of that interest.
    i. Whether Julian Echevarria— Echevarría's father—died intestate.
    j. Whether Julian Echevarria's wife and/or children—including Echevarría—

inherited any ownership interest in Cayo Coco from Julian Echevarria and, if so, the nature and extent of that interest.

k. Whether Cira Marquez— Echevarría's mother—died intestate.

l. Whether Cira Marquez's children—including Echevarría—inherited any ownership interest in Cayo Coco from Cira Echevarria and, if so, the nature and extent of that interest.

m. Whether Echevarría's brother, Carlos Echevarria, had a will at the time of his death that devised his assets—which would include any alleged interest he had in Cayo Coco—to his niece, Carmen Davis.

n. Whether Echevarría's sister, Carmen Echevarria, had a will at the time of her death that devised her assets—which would include any alleged interest she had in Cayo Coco—to her daughter, Carmen Davis.

3. Whether the Cuban Government "confiscated" (as that term is defined in 22 U.S.C. § 6023(4)) Cayo Coco and/or the parts of Cayo Coco where the Cayo Coco Hotels now stand, and if so, when and from whom.

4. Whether the land where the Cayo Coco Hotels now stand was within the maritime terrestrial zone owned by the Cuban State before January 1, 1959.

5. Whether the Cuban Government "confiscated" (as that term is defined in 22 U.S.C. § 6023(4)) the San Carlos and, if so, when and from whom.

6. Whether the parts of the subject property that Echevarría alleges Defendants trafficked in were used for residential purposes at the time of the alleged confiscation, or subsequently.

7. Whether the San Carlos was used for residential purposes at the time of the alleged confiscation, or subsequently.

8. As to each Defendant, whether that Defendant knowingly and intentionally engaged in a commercial activity using or otherwise benefitting from the San Carlos without the authorization of any U.S. national who holds a claim to the property, and if so, the date on which such commercial activity ceased.

9. To the extent any Defendant knowingly and intentionally engaged in a commercial activity using or otherwise benefitting from the San Carlos without the authorization of any U.S. national who holds a claim to the property, whether that commercial activity was incident and necessary to lawful travel to Cuba and, thus, not trafficking

under 22 U.S.C. § 6023(13)(B)(iii).

10. To the extent any Defendant knowingly and intentionally engaged in a commercial activity using or otherwise benefitting from the San Carlos without the authorization of any U.S. national who holds a claim to the property, whether any other Defendant knowingly and intentionally participated in or profited from that commercial activity.
11. Whether Expedia, Inc. knowingly and intentionally engaged in a commercial activity using or otherwise benefiting from any of the Cayo Coco Hotels and/or the land on which they stand without the authorization of any U.S. national who owns a claim to the property, and if so, the date on which such commercial activity ceased.
12. To the extent Expedia, Inc. knowingly and intentionally engaged in a commercial activity using or otherwise benefitting from any of the Cayo Coco Hotels without the authorization of any U.S. national who holds a claim to the property, whether that commercial activity was incident and necessary to lawful travel to Cuba and, thus, not trafficking under 22 U.S.C. § 6023(13)(B)(iii).
13. To the extent any Defendant knowingly and intentionally engaged in a commercial activity using or otherwise benefitting from any of the Subject Hotels without the authorization of any U.S. national who holds a claim to the property, whether that Defendant's conduct was authorized by OFAC, U.S. Department of Treasury, under the Cuban Assets Control Regulations ("CACR"), 31 CFR Part 515 and, thus, such that Plaintiffs' causes of action are barred by the Due Process Clause of the Fifth Amendment.
14. Whether Plaintiffs' actions are barred in whole or in part by Article II of the U.S. Constitution to the extent that Plaintiffs' claims seek to impose liability for foreign policy decisions made by the Executive Branch.
15. Whether Plaintiffs' proposed calculation of damages constitutes the current fair market value of the allegedly confiscated properties to which Plaintiffs purport to own claims and in which Defendants allegedly trafficked.
16. Whether the damages that Plaintiffs seek to recover are wholly disproportionate, grossly excessive, and bear no relationship to any conduct and dealings that Defendants had with respect to the properties at issue, thereby rendering them unconstitutional because they
17. Whether the causes of action that Echevarría asserted in *Del Valle v. Expedia Group,*

*Inc.*, No. 1:19-cv-22619-RNS; *Echevarria v. Expedia Group, Inc.*, No. 1:19-cv-22620-FAM, and *Echevarria v. Expedia Group, Inc.*, No. 1:19-cv-22621-FAM, sought monetary compensation by reason of the same subject matter as his cause of action in this suit, such that his causes of action in this suit are barred by 22 U.S.C. § 6082(f)(1)(A).

18. Whether the cause of action that Mata asserted (and later abandoned) in *Mata v. Grupo Hotelero Gran Caribe*, No. 1:19-cv-22025-JAL, sought monetary compensation by reason of the same subject matter as her cause of action in this suit, such that her causes of action in this suit are barred by 22 U.S.C. § 6082(f)(1)(A).
19. Whether the causes of action that Plaintiffs asserted (and later voluntarily dismissed) against the Booking Entities in this and other suits sought monetary compensation by reason of the same subject as their causes of action against Defendants in this suit, such that their causes of action in this suit are barred by 22 U.S.C. § 6082(f)(1)(A).

**(7) Statement of Agreed Issues of Law**

1. Under the Helms-Burton Act, the elements of Plaintiffs' causes of action are, subject to certain limitations,: (1) "any person"; (2) that "traffics"; (3) "in property which was confiscated by the Cuban Government on or after January 1, 1959"; (4) "shall be liable to any United States national"; (5) "who owns the claim to such property"; and (6) trafficking must occur after November 1, 1996. *See* 22 U.S.C. § 6082.
2. Each of the Plaintiffs is a U.S. National under 22 U.S.C. § 6023.
3. Each of Defendants is a *person* under 22 U.S.C. § 6023.
4. Under the Helms-Burton Act, excluded from the definition of *traffics* are "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22 U.S.C. § 6023(13)(B)(iii).
5. During the relevant time period, OFAC by general license authorized persons subject to U.S. jurisdiction to engage in travel to and from Cuba related to the following twelve activities: "(1) family visits; (2) official business of the U.S. government, foreign governments, and certain intergovernmental organizations; (3) journalistic activity; (4) professional research and professional meetings; (5) educational activities; (6) religious activities; (7) public performances, clinics, workshops, athletic and other

competitions, and exhibitions; (8) support for the Cuban people; (9) humanitarian projects; (10) activities of private foundations or research or educational institutes; (11) exportation, importation, or transmission of information or informational materials; and (12) certain export transactions that may be considered for authorization under existing Department of Commerce. *See* § 515.560(a) (2016) (citations omitted); *see also* 80 Fed. Reg. 2,295 (Jan. 16, 2015).

6. The relevant OFAC licenses and regulations for the relevant time-period are found at Title 31, Code of Federal Register, Sections 515.501, *et seq.*
7. During the relevant time period, subject to any other applicable OFAC regulations, OFAC authorized by general license persons subject to U.S. jurisdiction to provide travel services in connection with authorized travel-related transactions involving Cuba authorized pursuant to Part 515. § 515.572(a) (2016).
8. During the relevant time period, subject to any other applicable OFAC regulations, OFAC also authorized any transaction ordinarily incident to a licensed transaction and necessary to give effect thereto. § 515.421(a).
9. During the relevant time period, subject to any other applicable OFAC regulations, Persons subject to U.S. jurisdiction providing travel services pursuant to § 515.572(a) were required to obtain a certification from each customer indicating the section of Part 515 that authorizes the person to travel to Cuba. § 515.572(b).

## (8) Statement of Disputed Issues of Law to be Determined by the Court

1. The proper interpretation of the "knowingly and intentionally" requirement in the Act's definition of *traffics*.
2. Whether the Lawful Travel Clause is an affirmative defense.
3. The proper interpretation of the Lawful Travel Clause.
4. The appropriate instructions to give the Jury.
5. The additional issues set forth in the parties' pending motions.
6. Any necessary determinations of Cuban Law regarding ownership, inheritance, and confiscation pursuant to Rule 44.1.

### (8)(a) Plaintiffs' Additional Statement of Disputed Issues of Law to be Determined by the Court

1. Whether Defendants compliance with OFAC regulations and/or record-keeping requirements is relevant to a Helms Burton Claim.

2. Whether the Lawful Travel defense can apply to trafficking where Defendants admit no traveler stayed at the Subject Hotel.
3. Whether Plaintiffs claims against Expedia, Inc. relate back under Rule 15(c).

**(8)(b) Defendants' Additional Statement of Disputed Issues of Law to be Determined by the Court**

1. Whether under the Civil Code of 1889, the relevant Cuban law, "all acts or contracts concerning the creating, transfer, acquisition, modification, and extinction of property interests or immovable property must be proven by public document," which is defined as "those authorized by a Notary or by a competent public official, with the formalities required by the law." *Trinidad v. Expedia Grp., Inc.*, No. 1:19-cv-22629-FAM, 2024 WL 4634071, at *4 (S.D. Fla. Oct. 31, 2024).
2. Whether, under Article 371 of the Civil Code of 1889, the islands formed in the seas adjacent to the coasts of Cuba belonged to the Cuban State.
3. Whether Cayo Coco is one of those "islands formed in the seas adjacent to the costs of Cuba" that was owned by the Cuban State under Article 371 of the Civil Code of 1889.
4. If so, whether Echevarria has provided a "public document" or any other admissible evidence proving that the Cuban State transferred Cayo Coco to Juan Francisco Angulo or Julian Cuevas.
5. More generally, whether Echevarria has any evidence that constitutes a "public document," as that term is defined under Cuban law, evidencing Juan Francisco Angulo's or Julian Cuevas's acquisition of ownership of Cayo Coco.
6. Whether Mata has any evidence that constitutes a "public document," as that term is defined under Cuban law, evidencing Antonio Mata y Alvarez's or Antonio Alberto Lazaro Mata's acquisition of ownership of the San Carlos or the land on which it stands.
7. Whether, under the relevant Cuban law, the death of an individual did not operate to automatically transfer all of the assets in the decedent's estate to his heirs and successors; rather, Cuban law imposed a number of requirements necessary to distribute a decedent's estate to his or her heirs, including but not limited to a judicial order or declaration of heirs.
8. Whether Julian Echevarria (Echevarria's father) or Rosa Elvira Echevarria (Echevarria's aunt) inherited any property interests from their mother, Elvira Cuevas (Echevar-

ria's grandmother), in light of the fact that Ms. Cuevas died without a will and a declaration of her heirs was never registered.

9. Whether Julian Echevarria (Echevarria's father) or Rosa Elvira Echevarria (Echevarria's aunt) inherited any property interests from their aunt Carmen Cuevas, in light of the fact that Ms. Cuevas died without a will and a declaration of heirs was never registered.
10. Whether property must have been confiscated from a U.S. national in order to be subject to "a claim" under the Helms-Burton Act.[7]
11. Whether property owned by Cuban nationals at the time of its confiscation may be the subject of a claim under the Helms-Burton Act.
12. Whether Mata has pleaded a cause of action asserting that any Defendant trafficked in the San Carlos by purportedly participating in or profiting from the supposed trafficking of non-party Trivago N.V. ("Trivago").
13. Whether the scienter element in the definition of *traffics* requires Plaintiffs to establish that Defendants knew or should have known, at the time of the alleged trafficking, both (i) that the Subject Hotels stood on "confiscated" property and (ii) that a U.S. national held a claim to that property.
14. Whether the First Amended Complaint in this case provided information from which any Defendant knew or should have known that Cayo Coco Hotels stand on "confiscated" property, that Echevarria owns a claim to that property, and that Echevarria is a U.S. national.
15. To the extent a specific traveler's conduct is relevant, whether under 31 C.F.R. Part 515 a person traveling for purposes of a family visit is not required to keep a full-time schedule of activities supporting that purpose. *See* 31 C.F.R. § 515.561 (2016); *see also* 80 Fed. Reg. 2,295 (Jan. 16, 2015).
16. To the extent a specific traveler's conduct is relevant, whether under 31 C.F.R. Part 515, a person traveling for purposes of public performances, clinics, workshops, and competitions is not required to keep a full-time schedule of activities supporting that

[7] In *Regueiro v. Am. Airlines, Inc.*, 147 F.4th 1281 (11th Cir. 2025), the Eleventh Circuit held that the Helms-Burton Act does not require property to have been owned by a United States national when the Cuban government confiscated it, *id.* at 1288. Defendants include this issue in their list of legal issues to be decided in order to avoid any suggestion that they have waived the right to raise this argument with the *en banc* Eleventh Circuit or the Supreme Court, to the extent necessary.

purpose. *See* 31 C.F.R. § 515.567 (2016); *see also* 80 Fed. Reg. 2,298 (Jan. 16, 2015).

17. Whether, under 31 C.F.R. Part 515, the requirement for a traveler to maintain a full-time schedule of activities supporting the authorized purpose of travel did not preclude a traveler from engaging in other activities in the traveler's free time. *See* 31 C.F.R. §§ 515.533; 515.545; 515.559; 515.563; 515.564; 515.565; 515.566; 515.574; 515.575; 515.576 (2016); *see also* 80 Fed. Reg. 2,291, 2,293–94, 2,296–97, 2,300 (Jan. 16, 2015).
18. Whether, under 31 C.F.R. Part 515, the Operating Defendants were required to investigate or otherwise attempt to verify travelers' certifications that they were traveling to Cuba in connection with an authorized activity.
19. Whether a traveler's failure to comply with the terms of a general license while in Cuba renders any conduct by Defendants in connection with that traveler's booking outside the scope of the Lawful Travel Clause.
20. Whether Plaintiffs' causes of action are barred because they are premised on conduct undertaken by a foreign government and outside the United States.
21. Whether Plaintiffs' causes of action are barred by the Act of State Doctrine, which must be applied here because it has "constitutional underpinnings" and cannot be abrogated by Congress.
22. Whether 22 U.S.C. § 6084 bars Plaintiffs' causes of action against Expedia, Inc., in whole or in part.
23. If Plaintiffs' interpretation of the Helms-Burton Act is correct, whether the Helms-Burton Act is unconstitutionally vague.
24. Whether the doctrine of unclean hands is applicable to Plaintiffs' "legal claim."
25. Whether Echevarria engaged in wrongdoing that is directly related to his claim and that injured Defendants.
26. Whether Plaintiffs have standing under Article III of the Constitution, including:
    a. Whether Plaintiffs suffered an injury in fact caused by Defendants, and
    b. Whether the damages Plaintiffs seek in this case would redress any such injury.
27. To the extent Plaintiffs' causes of action are based on Defendants' listing or mentioning the Subject Hotels on their websites, whether they violate the First Amendment.

28. Whether the damages sought by Plaintiffs are wholly disproportionate to the offense and obviously unreasonable.
29. Whether the Helms-Burton Act's election of remedies provision bars recovery in light of Plaintiffs' settlement with the Booking Entities and/or Plaintiffs' bringing (and, in some cases, then abandoning) previous Helms-Burton actions based on their alleged claims to Cayo Coco and the San Carlos.
30. Whether the one-satisfaction rule bars recovery in light of Plaintiffs' settlement with the Booking Entities.
31. In the alternative, whether the compensation Plaintiffs received from the Booking Entities must be set off against any recovery they may receive from Defendants.
32. Whether the Eighth Amendment applies in cases where the United States is not a party to the case or sharing in the damages.
33. Whether the damages sought by Plaintiffs are excessive.
34. Whether the judgments in *Echevarria I* and *Echevarria II* preclude Echevarria's cause of action against Expedia, Inc. in this case under the doctrine of claim preclusion.

### (9) Exhibit Lists

Plaintiffs' Exhibit List (with Defendants' objections noted) is attached as **Exhibit A**.

Defendants' Exhibit List (with Plaintiff's objections noted) is attached as **Exhibit B**.

### (10) Witness Lists

Plaintiffs' Witness List is attached as **Exhibit C**.

Defendants' Witness List is attached as **Exhibit D**.

### (11) Estimated Trial Time

Plaintiffs estimate that the trial will take:

- Seven full trial days if their motion for summary judgment is granted,
- Ten to twelve full trial days if tried otherwise.

Defendants estimate that trial will take:

- Ten full trial days to try both Mata's and Echevarria's causes of action,
- Seven full trial days to try just Echevarria's cause of action (in the event the Court grants summary judgment only on Mata's causes of action), and

- Five full trial days to try just Mata's cause of action (in the event the Court grants summary judgment on only Echevarria's cause of action).

To the extent the Court grants Defendants' alternative requests for partial summary judgment on Mata's causes of action, Echevarria's causes of action, or both, these time estimates would likely change.

Defendants suggest that the Court put time limitations on each side's argument and presentation of evidence. Specifically, Defendants suggest that the Court set a total number of hours for the parties to conduct opening statements, witness examinations, and closing arguments, and then allocate those hours evenly between the two sides. The time that each side's attorneys use during opening statement, any witness examination (for direct or cross examination, as the case may be), and closing argument would be counted toward that side's total number of hours. Neither side could use more than their allocated number of hours. Many federal and state courts around the country employ timed trials, and Defendants' counsel has found them to be effective tools for ensuring that litigants conduct trials efficiently.

Plaintiffs disagree with rigid, pre-set, total-time rules, which are not necessary to efficiently conduct a trial. Importantly, because, the parties have different evidentiary burdens and elements to prove, such rigidity may lead to unfair results. Plaintiffs do not oppose standard time limits on openings and closings, *etc.*

**(12) Attorneys' Fees**

Under 22 U.S.C. § 6082(a)(1)(ii), a prevailing plaintiff is only entitled to recover "reasonable attorneys' fees."

Plaintiffs estimate that total reasonable attorneys' fees and costs incurred in the prosecution of this action through the conclusion of trial will reach approximately $2,000,000-$3,000,000.

Defendants cannot provide an estimate of the maximum amount properly allowable at this time because they have not been provided with any of Plaintiffs' attorney billing statements or time records. Defendants therefore reserve their right to challenge any and all aspects of any fee request at the time it's made. But given the length of time that this suit (as opposed to other suits) has been actively litigated and Defendant's view that much time was spent on unnecessary proceedings, Defendants' position will almost surely be that an award of $2,000,000–$3,000,000 would be unreasonable.

Respectfully submitted:

**Andrés Rivero**
Andrés Rivero (Fla. Bar No. 613819)
E-mail: arivero@riveromestre.com
Jorge A. Mestre (Fla. Bar No. 88145)
E-mail: jmestre@riveromestre.com
Alan Rolnick (Fla. Bar No. 715085)
E-mail: arolnick@riveromestre.com
Ana C. Malave (Fla. Bar No. 83839)
E-mail: amalave@riveromestre.com

Rivero Mestre LLP
2525 Ponce de Leon Blvd., Suite 1000
Coral Gables, Florida 33134
Telephone: (305) 445-2500

Manuel Vazquez (Fla. Bar No. 132826)
E-mail: mvaz@mvazlaw.com

MANUEL VAZQUEZ, P.A.
2332 Galiano St., Second Floor
Coral Gables, Florida 33134
Telephone: (305) 445-2344

*Counsel for Plaintiffs*

**Francisco R. Maderal**
John R. Byrne (Florida Bar No. 0126294)
E-Mail address: john@maderalbyrne.com
Francisco R. Maderal (Fla. Bar No. 41481)
E-Mail address: frank@maderalbyrne.com

Maderal Byrne & Furst PLLC
2800 Ponce De Leon Boulevard, Suite 1100
Coral Gables, Florida 33134
Telephone: (305) 520-5690

*Counsel for Maricela Mata*

SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300 Telephone
(512) 495-6399 Facsimile

By: ____________________
David D. Shank (pro hac vice)
Texas Bar No. 24075056
dshank@scottdoug.com
Cheryl Joseph (pro hac vice)
Texas Bar No. 24104015
cjoseph@scottdoug.com
Jane Webre (pro hac vice)
Texas Bar No. 21050060
jwebre@scottdoug.com
Lauren Ditty (pro hac vice)
Texas Bar No. 24116290
lditty@scottdoug.com
Rebecca Jahnke (pro hac vice)
Texas Bar No. 24129982
bjahnke@scottdoug.com
Mary Byars Bailey (pro hac vice)
Texas Bar No. 24097443
mbailey@scottdoug.com
Stephen Burbank (pro hac vice)
Texas Bar No. 24109672
sburbank@scottdoug.com
Santosh Aravind (pro hac vice)
Texas Bar No. 24095052
saravind@scottdoug.com
Morgan Menchaca (pro hac vice)
Texas Bar No. 24103877
mmenchaca@scottdoug.com

AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
(305) 374-5600 Telephone
(305) 349-4656 Facsimile

By: */s/ Lorayne Perez*
Lorayne Perez

Florida Bar No. 085265
lorayne.perez@akerman.com

*Attorneys for defendants Expedia Group, Inc., Expedia, Inc., Hotels.com L.P., Hotels.com GP, LLC, and Orbitz, LLC*